LORI E. ANDRUS (SBN 205816)
lori@andrusanderson.com
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone:    (415) 986-1400
Facsimile:    (415) 986-1474

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| JANE DOE,<br><br>Plaintiff,<br><br>vs.<br><br>STUART DINNIS,<br><br>Defendant. | **CASE NO. 4:18-cv-05393-DMR**<br><br>**DECLARATION OF PAUL LAPRAIRIE IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT UPON DEFAULT** |

I, Paul Laprairie, declare as follows:

1.      I am an associate in the law firm of Andrus Anderson LLP.  I am duly admitted to practice before the courts of the State of California, including the United States District Court for the Northern District of California.  I have personal knowledge of the facts set forth in this declaration, and, if called as a witness, I could and would testify thereto.  I submit this declaration in support of Plaintiff's Motion for Judgment Upon Default.

2.      Dinnis has not responded to the Complaint and neither he nor any counsel on his behalf have contacted Plaintiff or her counsel since the Complaint was filed.

3.      I prepared the attached Exhibit A which outlines the calculations of Plaintiff Jane Doe's Lost Compensation.  It is offered as demonstrative evidence of Plaintiff's damages and as a summary of the evidence provided in Jane Doe's declaration under Federal Rule of Evidence 1006.

4.      I prepared the attached Exhibit B which outlines the calculations of Plaintiff Jane Doe's Diminished Future Earnings.  It is offered as demonstrative evidence of Plaintiff's damages and as a summary of the evidence provided in Jane Doe's declaration under Federal Rule of Evidence 1006.

5.      In preparing the calculations for Plaintiff Jane Doe's Diminished Future Earnings, to determine Ms. Doe's worklife expectancy I referenced the *Retirement Age & Trend Analysis of the Executive Branch: Fiscal Year 2015 to Fiscal Year 2017,* United States Office of Personnel Management (Sept. 2018).

6.      In preparing the calculations for Plaintiff Jane Doe's Diminished Future Earnings, to determine the applicable interest rate, I averaged the 5-year treasury bond yields of the past 17 years as reported by the U.S. Department of the Treasury.  These rates are available online at: https://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=yield.

7.      Attached as Exhibit C is a true and correct copy of The Wall Street Journal article "When the Client Is a Harasser" from the July 7-8, 2018 edition.

1

8.      Attached as Exhibit D is a true and correct copy of excerpts from the deposition of Jane Doe taken November 2, 2018 by counsel for Virgin America, Inc. and Alaska Air Group, Inc.

9.      The Declaration of Benjamin J. Albritton in support of Plaintiff's Motion for Judgment Upon Entry of Default is offered as an expert opinion.  Dr. Albritton is qualified as an expert under Federal Rule of Evidence 702 by knowledge, skill, experience, training and education as evidenced by his curriculum vitae attached to his declaration.

10.     The exhibits to Jane Doe's declaration, consisting of her pay stubs, are authenticated by her testimony as a witness with knowledge under Federal Rules of Evidence 901(b)(1).

I declare under penalty of perjury pursuant to the laws of the state of California that the foregoing is true and correct.

February 28, 2019

_____
*/s/ Paul Laprairie*
Paul Laprairie

DECLARATION OF PAUL LAPRAIRIE IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT UPON DEFAULT

Case No: 4:18-cv-05393-DMR

# EXHIBIT A

## TO DECLARATION OF PAUL LAPRAIRIE — CALCULATIONS OF JANE DOE'S LOST COMPENSATION

**Plaintiff Doe's Lost Compensation**

| Plaintiff's Compensation Information | | |
|---|---|---|
| Salary at Research Now<br><br>At the time Plaintiff Doe was assaulted by the<br><br>Defendant, she was employed at Research Now | $150,000 annually | $12,500 monthly |
| Initial Salary at American Airlines<br><br>After Plaintiff Doe was forced to resign from her job<br><br>at Research Now, she took a position at her former<br><br>employer American Airlines. | $80,267 annually | $6,688 monthly |
| Post-Raise Salary at American Airlines<br><br>Beginning September 19, 2018 Plaintiff Doe received<br><br>a promotion and corresponding increase in pay at<br><br>American Airlines | $97,721 annually | $8,143 monthly |
| **Note**: Benefits were roughly equivalent between Research Now and American Airlines and have been excluded from the above.  Plaintiff Doe was eligible for a 20% bonus at Research Now ($30,000 per year), but as Plaintiff Doe left Research Now before it was awarded, it has been excluded from the Salary at Research Now.  This has the effect of underestimating her pre-assault earning potential. | | |

//

//

| Time Period of Plaintiff's Compensation | |
|---|---|
| American Airlines Compensation at Initial Salary<br>Plaintiff Doe began working at American Airlines following her<br>resignation from Research Now on March 6, 2017.  She was paid her<br>Initial Salary until she was promoted. | 18 months |

| American Airlines Compensation at Post-Raise Salary<br><br>On September 19, 2018 Plaintiff Doe was promoted and began receiving her Post-Raise Salary, which she continues to receive until the date of this Motion for Entry of Default | 4 months |
|---|---|
| **Note**: Time at each salary position is rounded down.  This has the effect of understating the time period she has received reduced pay for. | |

| Calculation of Plaintiff's Lost Compensation | |
|---|---|
| Compensation Lost at Initial Salary Rate<br><br>Calculated by taking the number of months at her Initial Salary (18) and multiplying it by the difference in monthly pay at Research Now and the monthly pay at her Initial Salary at American Airlines ($5,811.05). | $104,599.20 |
| Compensation Lost at Post-Raise Rate<br><br>Calculated by taking the number of months at her Post-Raise Salary (4) and multiplying it by the difference in monthly pay at Research Now and the monthly pay at her Post-Raise Salary ($4,356.57) | $17,462.28 |
| **Total Compensation Lost Since the Assault** | **$122,025.48** |

# EXHIBIT B

TO DECLARATION OF PAUL LAPRAIRIE — CALCULATIONS OF JANE DOE'S DIMINISHED FUTURE EARNINGS

**Plaintiff Doe's Diminished Future Earnings**

| Future Lost Earnings | |
|---|---|
| <u>Annual Gap in Earnings</u><br><br>Subtracting Plaintiff's current annual salary ($97,721.15) from her Research Now annual salary ($150,000) to arrive at the difference between what her compensation would have been before she was forced to resign from Research Now after the assault and what it is now. | $52,278.85 |
| <u>Worklife Expectancy</u><br><br>US Office of Personnel Management Average Retirement Age for a White Female (rounded down).  *Retirement Age & Trend Analysis of the Executive Branch: Fiscal Year 2015 to Fiscal Year 2017*, page 15, United States Office of Personnel Management (Sept. 2018).<br><br>**Note**: This is 4 years less than Plaintiff's intended retirement age. | 61 years |
| <u>Remaining Work Years</u><br><br>Difference between Plaintiff's current age (44) and her worklife expectancy (61). | 17 years |

| Calculation of Plaintiff's Future Lost Earnings | |
|---|---|
| <u>Interest Rate</u><br><br>The 17-year average of 5-year treasury bond yields is 2.48% rounded to the nearest whole number.<br><br>**Note**: Rounding up leads to a lower present value of Future Lost Earnings. | 3% |
| <u>Present Value Factor</u><br><br>Taken from the cell in CACI No. 3904B – Table A where Plaintiff's remaining work years (17) and interest rate (3%) intersect.  CACI No. | 13.17 |

| | |
|---|---|
| 3904B – Table A is used to multiply a repeating identical amount to arrive at the present value of damages. | |
| <u>Present Value of Future Lost Earnings</u><br><br>Annual Gap in Earnings times the Present Value Factor yields the present value of future lost earnings.<br><br>**Note**: The effect of inflation has been excluded from these calculations. Excluding inflation produces a smaller present value of future lost earnings than Plaintiff would be entitled to. | **$688,512.45** |

# EXHIBIT C
## TO DECLARATION OF PAUL LAPRAIRIE — WALL STREET JOURNAL ARTICLE



**Disney's Deals**
CEO Robert Iger's playbook faces its biggest test yet **B4**

# EXCHANGE

**Uneasy Riders**
Economists say it's hard to predict impact of trade wars **B12**



BUSINESS | FINANCE | TECHNOLOGY | MANAGEMENT

**THE WALL STREET JOURNAL.**   * * * *   SATURDAY/SUNDAY, JULY 7 - 8, 2018 | **B1**

DJIA 24456.48 ▲ 99.74 0.4%   NASDAQ 7688.39 ▲ 1.3%   STOXX 600 382.36 ▲ 0.2%   10-YR. TREAS. ▲ 3/32, yield 2.831%   OIL $73.80 ▲ $0.86   GOLD $1,254.30 ▼ $3.00   EURO $1.1744   YEN 110.46

## Markets Hit a Rut In China

### Investors predict trouble ahead for the economy

BY SHEN HONG

SHANGHAI—This year's selloff in China's stocks and currency is reviving painful memories of the country's last market rout, in the summer of 2015. If anything, things look more worrying this time around.

Shares in Shanghai are the world's worst performing among major markets this year, tumbling 17%. The yuan has slumped 3.6% against the dollar since the start of June, pushed down by a combination of selling by nervous investors and the Chinese central bank's efforts to guide the currency lower as a trade conflict with the U.S. escalates.

**Slump pales against 2015 market rout, but trade tensions with U.S. and other factors don't bode well for the future.**

On paper, even those big market moves pale in comparison with 2015. Three years ago the Shanghai Composite Index lost nearly half its value in the two months starting in June, bottoming out only in early 2016: They have never since regained their mid-2015 highs. The central bank also shocked markets with an abrupt 2% devaluation of the yuan in August that year.

More concerning this time is that several factors, including Beijing's campaign against high debt levels and its trade war with the U.S., suggest that investors are responding rationally to signs of fundamental problems for China's economy.

The U.S. placed tariffs on $34 billion worth of Chinese goods at midnight Eastern time on Friday. And while Shanghai stocks rose 0.5% on Friday, their fall this year has accelerated since trade tensions ramped up in the spring.

By contrast, in 2015 the market boom and bust was driven by retail investors who had taken on piles of debt

*Please turn to page B10*

## Sonos Heads For Trading —And Profit This Year

### Wireless-speaker maker files details ahead of IPO

BY MAUREEN FARRELL

Sonos Inc. pulled back the curtain Friday on its plans for an initial public offering, revealing a business that is on pace to turn a profit this fiscal year.

The wireless-speaker company's public filing with the Securities and Exchange Commission also showed it is on pace to generate more than $1 billion in annual revenue. The filing said Sonos products are in nearly 7

---

WHEN THE

# Client Is a Harasser

Companies struggle to confront misbehaving customers; a difficult position for sales staff

BY VANESSA FUHRMANS AND JULIE STEINBERG

In the new era of sexual-harassment accountability, companies have learned they can no longer give a pass to star employees accused of misconduct. Confronting high-dollar clients may be harder.

At many companies, client relationships are the most difficult to police—and the most important to protect. The conundrum is how to square the customer-is-king ethos with complaints, especially from women in client-facing jobs.

A former vice president at market-data firm **Research Now SSI** alleged in a lawsuit filed in April that a senior executive from the airline Virgin America, Stuart Dinnis, began kissing and groping her without warning in a hotel elevator late at night during a 2016 travel-industry conference.

Though she said she repeatedly said no,

Mr. Dinnis followed her to her hotel room, where he allegedly tried to push her inside by the back of her neck, saying, "You want it," according to the lawsuit. She alleged that Mr. Dinnis didn't leave until she crouched down in the hallway and refused to budge.

In a recent interview, she said she was terrified and also aware of the lopsided power dynamic between them. Earlier that day, she and her boss had discussed Mr. Dinnis, then Virgin America's director of loyalty, as an important client to cultivate during the conference. "In the back of my mind, I was thinking: 'This guy's a business partner,'" she said.

The next day, she said, she sought to keep things polite when Mr. Dinnis continued to text her, including a photo of an earring of hers that had lodged in his jacket during the

encounter. "Given our key partnership with your organization, it's best we keep things strictly professional," she wrote back, according to the lawsuit filed in federal court in San Francisco.

Mr. Dinnis declined to comment and hasn't responded to the suit in court.

The woman, who lives in Texas, says her bosses were supportive after she told them about the incident, but she left her job soon after in part because it required her to travel alone, which made her anxious.

She now works at an airline and said she filed her lawsuit under the pseudonym "Jane Doe" to protect the privacy of her children and her career.

The suit names Virgin America, its parent Alaska Air Group Inc. and Mr. Dinnis as defendants, alleging that Virgin America knew

*Please turn to the next page*

# When the Client Is a Harasser

*Continued from the prior page*

he had a track record of being sexually aggressive with women at firms with business ties to Virgin America.

A spokesman for Alaska Air declined to comment, except to say Mr. Dinnis left the airline before Alaska Air took it over. In filing a motion to dismiss the complaint, the airlines argued Mr. Dinnis's alleged actions fell outside the scope of his employment. Research Now SSI declined to comment.

Federal law holds employers just as liable for shielding staff from misbehaving third parties as from in-house offenders. But client harassment is a bigger blind spot for many companies, says Laurie Ruettimann, a consultant who advises companies on human-resources matters.

## A Difficult Conversation

Bosses often assume they have little control over the behavior of someone who isn't an employee or are loath to confront or drop a lucrative client, Ms. Ruettimann says. "When money is on the line, those conversations often don't take place."

The remedy companies often resort to is asking their worker if they want to leave the client's account. But that can set employees back in their careers, or make it harder for the employee to meet revenue targets that often determine commissions.

Sarah Centrella, a former technology saleswoman, says she was harassed by a large percentage of her predominantly male clients but never told her bosses. "What could they have done—take me off the account?" says Ms. Centrella, who left her last sales job in 2017. "That's how I made my money."

Ms. Centrella, who worked for a few different companies, declined to name her former employers. She said she never brought the incidents up with the companies and feels they weren't at fault.

She describes a frequent balancing act between sidestepping unwanted advances and taking pains not to offend clients. She also didn't want her male bosses or colleagues to think she couldn't handle an out-of-line customer. "I thought I was progressive because I wasn't crying about it," she says.

Conferences, where she was expected to book client meetings from morning to midnight, were particular minefields. At one Las Vegas trade show, she says, a prospective client insisted she accompany him to a strip club and promised other customers would be there. She reluctantly agreed, worried she might lose a sale or have to explain to her boss why she canceled a meeting.

On the way, he tried to kiss and grope her, told her to "lighten up" and put her hand on his groin, she says. At the club, she says, her discomfort grew. "Because I had gone, he thought he had even more leverage over me," she says. She soon left, she says, and never clinched the sale.

Executives are beginning to speak out more about this issue.

JPMorgan Chase & Co. Chairman and Chief Executive James Dimon said at a conference in December that women have asked him for help to handle clients acting inappropriately. "I tell [women], don't balance it at all, tell the client, 'Don't touch me again,' " he said.

But many women never tell their employers about their harassment. Among more than 7,000 female sales professionals, 57% reported receiving unwanted sexual advances or otherwise being ha-

## 35%

of employers said they had received harassment allegations in the past year

## 19%

of those who answered yes said the reports involved clients or other third parties.

Source: Society for Human Resource Management (a March survey of 544 human-resource officials)

rassed by clients, according to a recent poll by the National Association of Women Sales Professionals. A quarter of those women said they told a superior.

"The message you get is: 'You're an entrepreneur—you should be able to handle your own client or prospect,' " says Cynthia Barnes, the organization's CEO.

A March survey conducted by the Society for Human Resource Management showed 35% of more than 500 HR officials said they had received harassment complaints from employees in the past 12 months. Only one-fifth of those HR managers said they had dealt with allegations involving a customer or other third party.

Morgan Stanley says it has pro-

cesses in place to address allegations of sexual harassment of employees at the bank. However, the bank has maintained and expanded its relationship with a lucrative Chinese client, property developer Agile Group Holdings Ltd., since an alleged incident involving Agile's founder and chairman, Chen Zhuo Lin, and a Morgan Stanley banker. On a 2006 trip to court investors after the bank helped take Agile public, Mr. Chen allegedly entered the woman's London hotel room and tried to force himself on her, according to people familiar with the matter.

Bank executives learned of the allegation months later, in 2007, people familiar with the matter said. A senior Morgan Stanley banker then spoke to Mr. Chen, some of the people said.

The bank never discussed dropping Agile as a client nor reported the allegation to outside law-enforcement authorities, people familiar with the matter said. Some bankers who were aware of the alleged incident tried to avoid creating situations where female bankers would be alone with Mr. Chen, some of the people said.

Some of the people familiar with the situation said the woman was asked whether she wanted to be moved off the Agile account. She declined. The bank continued doing business with Agile: In 2008, a real-estate fund managed by Morgan Stanley bought a 30% stake in a resort property it developed jointly with Agile. Morgan Stanley sold the stake to Agile last year for $900 million, resulting in a profit of over $100 million for the firm and its investing clients. Morgan Stanley and other banks advised Agile on spinning off a unit in Hong Kong in February.

Citing privacy considerations, a Morgan Stanley spokesman declined to comment on details of the allegation but said any incident involving harassment of its employees was of great concern. "Our employees have always been encouraged to escalate issues," he said.

Lawyers for Mr. Chen said he denies the allegations and calls them "wholly inaccurate and baseless." "Our client definitely did not try to force himself on anyone in any hotel during the roadshow,"

the lawyers added. The lawyers also said The Wall Street Journal hadn't provided enough details about the allegations for Mr. Chen "to have a fair and proper opportunity to respond."

In 2013, Mr. Chen was charged with committing indecent assault in 2012, according to company filings from Agile. Hong Kong police said at the time that the incident involved a 28-year-old woman. Hong Kong prosecutors decided not to pursue the charges after Mr. Chen pledged not to commit indecent assault, according to the Hong Kong Department of Justice. According to media reports, Mr. Chen's lawyer at the time said in court the chairman had been drinking and had misread the situation. Mr. Chen's current lawyers said, "Our client continues to have a clean and unblemished criminal record."

Agile said it had no comment beyond a 2013 filing that said the matter hadn't affected its business. The filing also said Mr. Chen had told the company's board he pleaded not guilty.

## Legal Challenges

Courts have more recently grappled with how far employers should go to protect workers once they learn of harassment allegations against a client.

In a lawsuit filed in 2014, former AstraZeneca PLC sales representative Katherine Cozad alleged that the drugmaker hadn't done enough to protect her. She said that on a sales call to a family-practice physician in the Fresno, Calif., area, the doctor suddenly grabbed her crotch and kissed her. After the alleged incident, her manager said she no longer had to call on the doctor and stopped sending other primary-care sales representatives to him, depositions from AstraZeneca supervisors show. Yet, according to their testimony, the drugmaker didn't admonish or question the physician about Ms. Cozad's allegations, and another AstraZeneca sales team continued to visit him.

In 2016, a federal judge in California said she wasn't convinced the drugmaker had done enough to stop the physician from harassing again. AstraZeneca, which reached a confidential settlement with Ms. Cozad shortly afterward, said that when such allegations surface, the company tells any employee interacting with that doctor that they can stop making those calls or visit the doctor in pairs. In some cases, it said, it has dropped physicians altogether from its call lists. "The safety of our employees is of utmost importance to AstraZeneca," the company said.

Some employers say the only way to make employees feel protected is to put the onus on the customer. Francine Katsoudas, chief people officer at Cisco Systems Inc., says that in harassment cases, it is common procedure for the technology giant to confront the client. When one of its sales executives reported earlier this year that she had been harassed by someone at a Cisco client, a senior Cisco manager took up the issue with her counterpart at the other firm, which removed the person from the Cisco account, Ms. Katsoudas said.

"In that situation, there's a risk because you do business with this partner," she said, "but we're very clear on what the right thing to do is."

*—Ese Erheriene and Chester Yung contributed to this article.*



BILL BRAGG

# EXHIBIT D

TO DECLARATION OF PAUL LAPRAIRIE — EXCERPTS FROM JANE DOE'S DEPOSITION

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                   OAKLAND DIVISION

 4

 5   JANE DOE,

 6         PLAINTIFF,

 7      vs.                        NO. 4:18-CV-02420-DMR

 8   VIRGIN AMERICA, INC., ALASKA

 9   AIR GROUP, INC. AND STUART

10   DINNIS,

11         DEFENDANTS.

12   _____

13

14         VIDEOTAPED DEPOSITION OF ███████████

15              SAN FRANCISCO, CALIFORNIA

16             FRIDAY, NOVEMBER 2, 2018

17                   VOLUME I

18

19

20

21   REPORTED BY:

22   MEGAN F. ALVAREZ, RPR, CSR No. 12470

23   JOB NO. 3066297

24   PAGES 1 - 298

25   PAGES 126, 129, 130 Confidential and Bound Separate
```

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               OAKLAND DIVISION

4

5    JANE DOE,

6          PLAINTIFF,

7       vs.                    NO. 4:18-CV-02420-DMR

8    VIRGIN AMERICA, INC., ALASKA

9    AIR GROUP, INC. AND STUART

10   DINNIS,

11         DEFENDANTS.

12    _____

13

14

15

16          Videotaped Deposition of ██████████,

17   Volume I, taken on behalf of Defendants, at Cornerstone

18   Law Group, 351 California Street, Suite 600, San

19   Francisco, California, beginning at 9:02 a.m. and ending

20   at 4:19 p.m. on Friday, November 2, 2018, before

21   Megan F. Alvarez, RPR, Certified Shorthand Reporter

22   No. 12470.

23

24

25

                                              Page  2

```
 1   APPEARANCES:

 2

 3   FOR PLAINTIFF:

 4            BY:  LORI ANDRUS, ESQ.

 5            ANDRUS ANDERSON LLP

 6            155 MONTGOMERY STREET, SUITE 900

 7            SAN FRANCISCO, CALIFORNIA 94104

 8            415.986.1400

 9            415.986.1474 FAX

10            LORI@ANDRUSANDERSON.COM

11

12   FOR DEFENDANTS VIRGIN AMERICA, INC., AND ALASKA AIR

13   GROUP, INC.:

14            BY:  PAUL J. BYRNE, ESQ.

15            CORNERSTONE LAW GROUP

16            351 CALIFORNIA STREET, SUITE 600

17            SAN FRANCISCO, CALIFORNIA 94110

18            415.357.2094

19            415.974.6433 FAX

20            PBYRNE@CORNERLAW.COM

21

22   THE VIDEO OPERATOR:

23            BRANDON MILLER, VERITEXT

24

25
```

Page 3

1          A.    The only other people I would have          11:07:32

2     traveled with would have been local.               11:07:34

3          Q.    And describe to me how you were feeling   11:07:37

4     about this, spending so much time in that -- in    11:07:40

5     New York in December, hotel rooms alone.  Tell me  11:07:44

6     about how you were feeling.                         11:07:48

7          A.    That's when I began to kind of understand 11:07:54

8     that I had more of a -- a problem with it.          11:07:56

9          Q.    Okay.                                     11:07:58

10         A.    I think I had tried to suppress those     11:08:00

11    feelings due to the impact of my job or me, allowing 11:08:02

12    them to know that I couldn't handle it of sorts      11:08:07

13    because such as my job depended on it.  Right?  And  11:08:11

14    coming back after the holidays and knowing that we   11:08:14

15    had a full list of partners that I would need to be  11:08:24

16    traveling to see was really tough for me             11:08:28

17    emotionally.                                         11:08:30

18         Q.    And at some point you resigned from       11:08:36

19    Research Now, correct?                               11:08:38

20         A.    Yes.                                      11:08:39

21         Q.    And why was that?                         11:08:41

22         A.    When we sat down to talk about all the    11:08:48

23    partnerships, how many and who needed to be seen and 11:08:50

24    dates, and all of that, it was overwhelming to me,   11:08:53

25    and I struggled with it overall.                     11:08:56

Page 100

```
 1            And we were sitting discussing that        11:09:00

 2    specific thing with Ryan, and I just leaned back in  11:09:03

 3    my chair and I was like, "You know what?  I can't do  11:09:06

 4    this."                                                11:09:09

 5            And he was like, "What do you mean?"          11:09:09

 6            "I just can't do it."                         11:09:13

 7            And so he said, "Why don't you take some      11:09:14

 8    time to think about that."                            11:09:21

 9            And I said, "I have been."                     11:09:22

10            And so I -- I verbally resigned that day.      11:09:24

11    Q.   And what day was that?                           11:09:32

12    A.   I don't have a date.                             11:09:36

13    Q.   Was it in December or January?                   11:09:38

14    A.   It was early January.                            11:09:39

15    Q.   2017?                                            11:09:41

16    A.   2017.                                            11:09:42

17            And all he asked was, "If I can ensure         11:09:42

18    that you're not traveling, will you stay on a month   11:09:45

19    with us, and we'll get a replacement in?"             11:09:49

20            And I said, "Absolutely."                     11:09:51

21    Q.   Did you -- and you said -- who was the           11:09:57

22    person?  This was --                                  11:10:06

23    A.   My boss, Ryan Jantz.                             11:10:07

24    Q.   Okay.  J-A-N-T-Z?                                11:10:09

25    A.   Yes.                                             11:10:12
```

Page 101

| | | |
|---|---|---|
| 1 | Q.   All right.  Did you have any -- at that | 11:10:12 |
| 2 | time, did you have any discussion with Ryan about | 11:10:17 |
| 3 | accommodating your concerns over travel other than, | 11:10:19 |
| 4 | you know, "Hey, you don't have to travel for a | 11:10:22 |
| 5 | month.  Can you stick around?" | 11:10:24 |
| 6 | A.   No.  That's the primary thing that we | 11:10:29 |
| 7 | discussed:  I wouldn't be going out to partnerships. | 11:10:32 |
| 8 | Q.   And was there any discussion about whether | 11:10:40 |
| 9 | there was a way to continue working in your position | 11:10:41 |
| 10 | without having to travel as much? | 11:10:44 |
| 11 | A.   The only thing that was discussed later -- | 11:10:50 |
| 12 | it was not during that time -- was to basically take | 11:10:52 |
| 13 | a demotion to an account manager position where I | 11:10:55 |
| 14 | wasn't traveling. | 11:11:00 |
| 15 | Q.   And what did you understand that demotion | 11:11:01 |
| 16 | to be? | 11:11:08 |
| 17 | A.   The people that work on my team that are | 11:11:09 |
| 18 | senior account managers and that lead do have a lot | 11:11:11 |
| 19 | of flexibility to just work from home if they need | 11:11:15 |
| 20 | to.  And dependent upon which accounts you're given, | 11:11:17 |
| 21 | you may or may not be traveling very much. | 11:11:22 |
| 22 | Q.   Did you have an understanding of what the | 11:11:28 |
| 23 | salary of your folks working under you -- similar | 11:11:30 |
| 24 | positions that you could have been demoted to? | 11:11:33 |
| 25 | A.   Yes. | 11:11:35 |

Page 102

1      Q.   What was that?                              11:11:37

2      A.   Anywhere from 60,000 to potentially 85, I   11:11:38

3  think, may have been the top salary that someone on  11:11:40

4  my team was making at the time.                      11:11:44

5      Q.   If you know, were those positions eligible  11:11:49

6  for bonuses?                                         11:11:53

7      A.   I honestly don't recall.  I don't believe  11:11:58

8  so, but I don't recall 100 percent.                  11:12:01

9      Q.   Okay.  Did you ever think about taking a    11:12:03

10  demotion or taking a different job that didn't       11:12:06

11  require as much travel and staying at Research Now?  11:12:10

12      A.   I thought about it.  But with everything    11:12:20

13  that had gone on, it was just -- I felt like it      11:12:22

14  wasn't the -- the right thing for me to do.          11:12:31

15      Q.   Why?                                        11:12:38

16      A.   There were just a lot of stressors, too,   11:12:39

17  of them still being partners with Virgin and, you    11:12:41

18  know, the business aspect.  And it's embarrassing.   11:12:44

19  I mean, right?  You go from a VP job to take a       11:12:49

20  senior account manager role is demeaning, and so     11:12:54

21  there's talk and what are people going to say.       11:13:00

22      Q.   Were people on your team aware of what      11:13:06

23  happened to you in Toronto at Research Now?          11:13:09

24      A.   There were two individuals I spoke to       11:13:13

25  about the incident, yes.                             11:13:16

                                            Page 103

```
 1        A.   Correct.                              13:27:50

 2        Q.   Again, if anything comes up today, just    13:27:52

 3   let me know.  Okay?                             13:27:54

 4        A.   (Witness nods head.)                  13:27:56

 5        Q.   All right.  Good.                     13:28:08

 6             One other -- I just want to close out one  13:28:09

 7   area.  I think you had, but I -- going back to your  13:28:11

 8   health and how the incident that's the subject of   13:28:18

 9   this lawsuit has affected your health.          13:28:21

10             Have you described to me all of the   13:28:24

11   ways -- all of the ways that your physical and  13:28:30

12   mental health have been affected potentially by the 13:28:31

13   incident that's the subject of this lawsuit?    13:28:36

14        A.   I think -- I think I touched on a few  13:28:38

15   things, but I'd like to clarify.               13:28:41

16             Again, after knowledge and discussions 13:28:44

17   with these women, of course it brought up some  13:28:47

18   pretty horrendous feelings and experiences,     13:28:49

19   flashbacks for me personally.                   13:28:56

20             I began, very early on after the attack, 13:28:58

21   to have nightmares.  They escalated again in the 13:29:02

22   late spring.                                    13:29:07

23             One of the recurring nightmares I would  13:29:13

24   have is that there was these women in a hotel, I'd  13:29:16

25   be in a hallway, and they were screaming for me to  13:29:18
```

Page 171

| | | |
|---|---|---|
| 1 | help them.  And I would essentially be trying to run | 13:29:27 |
| 2 | to get to these voices, women, and I would feel a | 13:29:34 |
| 3 | push from the back.  And when I fell forward, I | 13:29:41 |
| 4 | would wake up. | 13:29:43 |
| 5 | And in May, I remember it was late | 13:29:45 |
| 6 | May 2017 and I woke up and I couldn't -- I could not | 13:29:47 |
| 7 | breathe.  I -- I couldn't get enough air.  I stood | 13:29:54 |
| 8 | up.  I put my hands over my head.  I was shaking.  I | 13:29:59 |
| 9 | remember feeling like I was just going to pass out | 13:30:04 |
| 10 | completely. | 13:30:09 |
| 11 | And I went upstairs to my daughter's room. | 13:30:10 |
| 12 | I woke her up, my daughter ███, my oldest | 13:30:13 |
| 13 | daughter, because I said, "Please stay with me.  If | 13:30:17 |
| 14 | I black out or I pass out, I need you to call 911." | 13:30:20 |
| 15 | And that's the hardest thing, is that they | 13:30:26 |
| 16 | would either be sleeping with me -- I know ███ | 13:30:32 |
| 17 | would wake me up at night when I was screaming, and | 13:30:35 |
| 18 | she'd say, "Mom, you've got to stop." | 13:30:36 |
| 19 | Just flashbacks. | 13:30:42 |
| 20 | Q.   When was the last time you had that type | 13:30:46 |
| 21 | of flashback?  When was the last time you had that | 13:30:49 |
| 22 | type of flashback? | 13:30:49 |
| 23 | A.   I was having them most often between the | 13:30:57 |
| 24 | April and August/September 2017 time frame. | 13:31:06 |
| 25 | I have a couple of times, you know, still | 13:31:16 |

Page 172

| | | |
|---|---|---|
| 1 | I'll wake up in sweats, you know, having a | 13:31:18 |
| 2 | nightmare, things like that. | 13:31:21 |
| 3 | But any other major heart rate or kind of | 13:31:25 |
| 4 | issue that I would sense would only be from what we | 13:31:28 |
| 5 | described earlier:  If there's any sudden -- someone | 13:31:32 |
| 6 | running on an elevator, or, you know, catching | 13:31:37 |
| 7 | myself, not want to get on because there is a male | 13:31:41 |
| 8 | figure on the elevator and I'll wait.  You know, I | 13:31:43 |
| 9 | can tell me heart rate gets up. | 13:31:46 |
| 10 | But those are the type, the only... | 13:31:48 |
| 11 | Q.   Do you recall having those type of | 13:31:54 |
| 12 | flashbacks prior to speaking to Ms. Botero? | 13:31:56 |
| 13 | A.   I did. | 13:31:59 |
| 14 | Q.   And take me -- when was the -- was the | 13:32:01 |
| 15 | earliest in April 2017? | 13:32:02 |
| 16 | A.   The earliest for any, like, flashbacks and | 13:32:06 |
| 17 | nightmares, I had them very recently after the | 13:32:08 |
| 18 | attack.  That's another reason why I reached out to, | 13:32:13 |
| 19 | you know, some type of counselor, because I thought, | 13:32:19 |
| 20 | you know, maybe I -- that would help. | 13:32:22 |
| 21 | And HR put me in touch with the | 13:32:24 |
| 22 | individuals to talk to. | 13:32:26 |
| 23 | You know, tried just different coping | 13:32:31 |
| 24 | skills.  I'm trying to, you know, things that they | 13:32:33 |
| 25 | say, write it down.  I had a really hard time with | 13:32:36 |

Page 173