1   LORI E. ANDRUS (SBN 205816)
    lori@andrusanderson.com
2   ANDRUS ANDERSON LLP
    155 Montgomery Street, Suite 900
3   San Francisco, CA  94104
    Telephone:     (415) 986-1400
4   Facsimile:     (415) 986-1474
5
    *Attorneys for Plaintiff*
6

7               UNITED STATES DISTRICT COURT

8         FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                    OAKLAND DIVISION

10

11   JANE DOE,                          **CASE NO. 4:18-cv-05393-DMR**

12              Plaintiff,              **SUPPLEMENTAL DECLARATION OF
                                         LORI E. ANDRUS IN SUPPORT OF
13        vs.                            PLAINTIFF'S MOTION FOR
                                         JUDGMENT UPON DEFAULT**
14   STUART DINNIS,

15              Defendant.

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Lori E. Andrus, declare as follows:

1.      I am an attorney with the law firm of Andrus Anderson LLP.  I am duly admitted to practice before the courts of the State of California.  I am an attorney of record for Plaintiff in the above-captioned matter.  I make this declaration based on my personal knowledge of the facts contained herein, and if called as a witness I could and would competently testify thereto.

2.      This declaration and supporting exhibits are submitted pursuant to the Court's Minute Order of November 14, 2019.

3.      The First Amended Complaint ("FAC") including allegations regarding the citizenship of the parties has been filed in this matter.  *See* FAC, ¶¶ 2-3.  I am serving the FAC on Dinnis and will file the proof of service forthwith.

4.      An unredacted version of Plaintiff's Notice of Motion and Motion for Judgment Upon Default; Memorandum of Points and Authorities in Support has been filed in this matter.

5.      An unredacted version of the Declaration of Jane Doe In Support of Plaintiff's Motion and Motion for Judgment Upon Default has been filed in this matter.  Jane Doe's true name has been redacted from the exhibits, in accordance with the Court's order permitting Doe to proceed using a pseudonym.

6.      An unsealed version of the Declaration of Jane Doe's daughter In Support of Plaintiff's Motion and Motion for Judgment Upon Default has been filed in this matter.  Jane Doe's daughter's true name has been redacted from the declaration, in accordance with the Court's order permitting Doe to proceed using a pseudonym.

7.      An unsealed version of the Declaration of Paul Laprairie In Support of Plaintiff's Motion and Motion for Judgment Upon Default has been filed in this matter.  Jane Doe's true name, and the name of her daughter, has been redacted from the exhibits, in accordance with the Court's order permitting Doe to proceed using a pseudonym.

8.      An unsealed version of the Declaration of Benjamin Albritton In Support of Plaintiff's Motion and Motion for Judgment Upon Default has been filed in this matter.

SUPPLEMENTAL DECLARATION OF LORI ANDRUS IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT UPON DEFAULT

Case No: 4:18-cv-05393-DMR

9.      The Second Doe Declaration In Support Of Plaintiff's Motion For Judgment Upon Default has been filed in this matter, in which Ms. Doe swears that she has not received or recovered any money for the lost/reduced income she is seeking in this matter.

10.      Attached hereto as Exhibits F, H and I are documents showing Mr. Dinnis' intention to remain in California at the time of the assault, and afterwards.

(a)      Exhibit F shows that Dinnis maintained a cell phone with a Bay Area phone number.

(b)      Exhibit H is an offer letter regarding "the continuation of [Dinnis'] employment with Virgin America, Inc. upon its purchase of Alaska Air Group, Inc."  In the offer letter, Andrew Harrison, Executive Vice President and Chief Commercial Officer told Dinnis: "Stuart, I'm looking forward to you playing a key leadership role in the path forward for Virgin America guests and teammates."  *Id.*  The offer letter was accompanied by an employment contract (titled "Addendum to Offer Letter"), wich Dinnis signed on July 12, 2016.  *Id.*  The Addendum to Offer Letter set forth the terms of Dinnis' continued employment after finalization of the incorporation of Virgin America into Alaska Airlines, and included a retention bonus for him for an 18-month period.  *Id.*  The Addendum to Offer Letter identified the laws of the state of California as governing any disputes.  *Id.*

(c)      Exhibit I is an email from Dinnis to his superiors after the assault, in which he said: "I beg Virgin America to preserve my employment and support my actions above and believe I still have a lot of contribute to the merged [Virgin/Alaska] entity and am more than willing to work hard and comply with all requirements to ensure this never happens again."  *Id.*

*          *          *

2

SUPPLEMENTAL DECLARATION OF LORI ANDRUS IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT UPON DEFAULT

1        I declare under penalty of perjury pursuant to the laws of the state of California that the

2    foregoing is true and correct.

3

4    Dated: December 4, 2019

5                                                Lori E. Andrus, Esq.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPPLEMENTAL DECLARATION OF LORI ANDRUS IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT UPON DEFAULT

Case No: 4:18-cv-05393-DMR

# EXHIBIT F

**From:** Stuart Dinnis on behalf of Stuart Dinnis ███████████████████████
**To:** Phil Gunter
**Subject:** Re: Mega event & SFO visit
**Date:** Thursday, October 22, 2015 6:23:55 PM

Phil,

I'm not leaving San Diego until 5.25pm on Thursday so am not back in SF until ~7pm so dinner will be out.

I have a lunch on Friday 6th too.  Do you really want to come to SF or do you want to spend sometime together at the conference and then on Thursday afternoon before my flight?

Points are ████ each, we have a high reward value to the currency.  I'll do ██ points plus Gold for some of your time during the conference and 2 hours on Thursday afternoon.

If you really want to come to SF then I'll see if I can get out of the lunch.  I'm a substitute on the lunch anyway as most of our team are in HNL that week with our inaugural launch and party with Sir RB.

Regards,
Stuart

On Thu, Oct 22, 2015 at 3:14 PM, Phil Gunter ███████████████████ wrote:

> Hello Stuart
>
> Of course I understand! And your proposed solution is not as uncommon as
> you may think!
>
> How about this -
>
> I come to SFO after the Mega event – if you are free we can have dinner
> that night (Thursday 5th) and then do whatever you need on the the Friday.
>
> Happy to get points rather than $$$ - Is ████ in points about right?
>
> Kind Regards
>
> *Phil*
>
> Phil Gunter     New World Loyalty   *P.  *████████████   *E.  *
> ██████████████████████████
>
>
> Good planets are hard to find - please think of the  environment before
> you print this email
>
>
>
> CAUTION - This message may contain privileged and confidential information
> intended only for the use of the addressee named above.If you are not the

> intended recipient of this message you are hereby notified that any use,
> dissemination, distribution or reproduction of this message is prohibited.
> If you have received this message in error please notify New World Loyalty
> immediately. Any views expressed in this message are those of the
> individual sender and may not necessarily reflect the views of New World
> Loyalty.
>
> For more information on New World Loyalty, visit
> http://www.newworldloyalty.com
>
>
> From: "stuart.dinnis ████████████████████████████
> Date: Friday, 23 October 2015 1:50 am
> To: Phil Gunter ███████████████████
> Subject: Re: Mega event & SFO visit
>
> Hi Phil,
>
> Yeah things are going well, busy but feel like I fit in here and am making
> a difference.
>
> Would love to have you here but payment is an issue for me as everything
> goes through the CFO and his procurement team!!  Its worst than VA became a
> little because its so much smaller.
>
> Would you accept payment in points instead?  I'll throw in a status match
> of your Velocity Platinum to our Elevate Gold Status as well ;-)
>
> I understand that it probably doesn't work but keen to catchup in San
> Diego for a beer in any case.
>
> Regards,
> Stuart
>
>
>
> On Sat, Oct 17, 2015 at 9:02 PM, Phil Gunter ███████████████████████
> wrote:
>
>> Hello Stuart
>>
>> I hope that you are going well – you certainly seem to be having fun on
>> facebook!
>>
>> I have a spare day immediately before the Mega event – Monday 2nd
>> November. One option would be to come via SFO and spend the day with you
>> there? Would that be of any value to you? I would only charge a mates rate
>> of US$1000 plus accomodation.
>>
>> Happy to have a call to discuss if it helps.
>>
>> Kind Regards
>>
>> *Phil*
>>
>> Phil Gunter    New World Loyalty   *P.  * ████████████     *E.  *
>> ███████████████████

>>
>>
>> Good planets are hard to find - please think of the  environment before
>> you print this email
>>
>>
>>
>> CAUTION - This message may contain privileged and
>> confidential information intended only for the use of the addressee named
>> above.If you are not the intended recipient of this message you are
>> hereby notified that any use, dissemination, distribution or
>> reproduction of this message is prohibited. If you have received this
>> message in error please notify New World Loyalty immediately. Any views
>> expressed in this message are those of the individual sender and may
>> not necessarily reflect the views of New World Loyalty.
>>
>> For more information on New World Loyalty, visit
>> http://www newworldloyalty.com
>>
>>
>>
>
>
> --
>
>
> Stuart Dinnis
> Director of Loyalty
> M. +1 650 ███████
>
> W. +1 650.762.7016
>
> ███  Airport Blvd
> Burlingame, CA 94010
>
>
>


--

Stuart Dinnis
Director of Loyalty
M. +1 650 ██████

W. +1 650.762.7016

███ Airport Blvd
Burlingame, CA 94010

# EXHIBIT H



June 24, 2016

Stuart Dinnis, Director Guest Loyalty
Virgin America Inc.
██  Airport Boulevard
Burlingame, CA  94010

Stuart,

I'm pleased to confirm the continuation of your employment with Virgin America Inc. upon its purchase by Alaska Air Group, Inc. ("the Closing Date"). This letter provides the key terms of the arrangement.  The enclosed addendum to this letter provides various legal and benefits information about your role and the compensation described below.  The addendum is part of this offer letter.

Key Terms:

> Your position as a Virgin America employee will extend for eighteen (18) months after the Closing Date ("the Employment Period") and your salary will continue at your current annual rate of  **Reda**   Your title will be Managing Director Guest Loyalty. The Employment Period will continue uninterrupted if we opt to move you to the payroll of our subsidiary Alaska Airlines, Inc.

> If you are an active employee on the last day of 2016, you will be eligible to receive a payout under Virgin America's Incentive Compensation Plan (ICP) based on actual performance which will be paid in the first quarter of 2017.

> Your Virgin America equity will vest on an accelerated basis on the Closing Date under the *Agreement and Plan of Merger.*

> Your career counseling stipend and COBRA benefits under the *Virgin America Inc. Change in Control (CIC) Severance Plan* will be paid by us.
> - Your career counseling stipend will be available 60 days prior to the end of the Employment Period.
> - Your COBRA benefits will be available to you at the end of the Employment Period.

> You will waive your cash severance under the CIC plan and be provided with cash in the same amount which will be paid to you in two installments – the first half within 60 days

PO Box 68900, Seattle, WA 98168
██████████

CONFIDENTIAL



VX00083



Stuart Dinnis, Page 2 of 3
June 24, 2016

following the Closing Date and the second half at conclusion of your Employment Period.

In exchange for these and other benefits, you will be required to provide a release of claims now and after the Closing Date. You also will be required to sign a release at the conclusion of the Employment Period.

You will also receive a retention bonus of ▮▮▮▮▮▮▮▮▮ ("Retention Bonus") of your employment from the Closing Date through the conclusion of the Employment Period. The Retention Bonus will be paid on a quarterly basis during your Employment Period.

Beginning in 2017, you'll participate in the Alaska Airlines Performance Based Pay (PBP) plan, our cash incentive plan, with a target participation rate of ▮▮▮ of your base salary and a maximum payout of ▮▮▮. The plan goals are generally based on a combination of financial and operational metrics and calculated based on your eligible earnings during the plan year.

Your benefit under the Alaska Airlines 2017 PBP plan will be paid in the first quarter of 2018. If your Employment Period concludes during a plan year, you'll receive a pro-rata payment based on your target participation rate for the number of months worked. You'll also participate in the Alaska Airlines Operational Performance Rewards (OPR) program established for 2017.

Your existing health care, retirement, other benefits, and travel will continue through your employment at Virgin America. Should you be placed on the Alaska Airlines payroll at any point during the Employment Period, you'll transition to the Alaska benefits plan and travel program.

In exchange for waiving your travel benefit rights under the CIC plan, you and your eligible dependents will be provided with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ on Virgin America beginning at the conclusion of the Employment Period. Upon merging of the Virgin America and Alaska Airlines travel programs, your travel will be on Alaska Airlines only.



CONFIDENTIAL



Stuart Dinnis, Page 3 of 3
June 24, 2016

During the Employment Period, you and your eligible dependents will receive ███████
███████████ on Alaska Airlines and Horizon Air in addition to your Virgin
America travel privileges. Finally, you'll be provided with a ██████████████ ████
███████████████████ for 2017 and 2018 (and for the balance of 2016
should Closing Date occur prior to the end of 2016).

Stuart, I'm looking forward to you playing a key leadership role in the path forward for Virgin
America guests and teammates. I know you'll find this to be an engaging assignment, and we
look forward to hearing from you.

Sincerely,

*Andrew Harr—*

Andrew Harrison, EVP Chief Commercial Officer

Please sign below to acknowledge your acceptance of this contingent offer of employment.
Once signed, you should return this letter and your signed release agreement to Peggy
████████████████████████████████

*Stuart Dinnis* signature                     07/13/2016
_____        _____
Stuart Dinnis                                                    Date



CONFIDENTIAL

## ADDENDUM TO OFFER LETTER

This Addendum includes additional provisions applicable to the offer letter provided to you by Alaska Airlines, Inc., dated June 24, 2016 (the "Offer Letter"). The provisions of this Addendum set forth below are incorporated by reference into and made a part of your Offer Letter.

1. <u>Employment Relationship</u>. Employment with Virgin America Inc. ("Virgin America"), Alaska Airlines, Inc. ("Alaska Airlines") or any of their respective subsidiaries or affiliates (collectively, the "Company"), including the period prior to the closing of the acquisition of Virgin America by Alaska Air Group, Inc. ("AAG"), is for no specific period of time. Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause, and with or without prior notice. Any contrary representations which may have been made to you are superseded by this offer. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and an officer of the Company who has been duly authorized to enter into such agreement on behalf of the Company. You hereby agree to comply with all applicable Company policies as in effect from time to time.

Notwithstanding any other provision herein or in the Offer Letter or any release agreement or other document, your employment with the Company will terminate (to the extent not previously terminated) on the last day of the scheduled Employment Period set forth in your Offer Letter.

2. <u>Involuntary Termination (Other Than for Misconduct or Cause)</u>. If your employment is terminated by the Company for any reason other than Misconduct (as defined below) or Cause (as defined below), you will be entitled to the following payments (subject to your providing a release of claims upon your termination as referred to in the Offer Letter), such payments to be made in a lump sum on the sixtieth day following your termination of employment:

- A payment equal to the aggregate base salary you would have been entitled to receive under the Offer Letter for the period from the date of your termination of employment through the <u>earlier</u> of (i) the date that is six months after your termination or (ii) the scheduled end of your Employment Period as set forth in your Offer Letter (had your employment with the Company continued through such period); and

- If your termination of employment occurs in 2017 or later, a payment equal to the sum of (i) a pro-rated portion of your target bonus under the Alaska Airlines Performance Based Pay plan for the year in which your termination of employment occurs (based on the number of whole months in such year that have elapsed as of your termination date), and (ii) an amount equal to (A) your <u>monthly</u>

VX00086

target bonus (i.e. one-twelfth of your target bonus for the year in which your termination of employment occurs) multiplied by (B) the <u>lesser</u> of six months or the number of whole months between your termination date and the scheduled end of your Employment Period as set forth in your Offer Letter.

For avoidance of doubt, if you voluntarily terminate your employment or if your employment is terminated by the Company for Misconduct (as defined below) or Cause (as defined below), or if your employment by the Company ends due to your death or disability, you will <u>not</u> be entitled to the payments described above in this Section.

3.  <u>Closing and Employment Period Bonuses</u>.  As described in the Offer Letter, you will be eligible to receive two bonuses in connection with your waiver of your right to receive cash severance under the *Virgin America Inc. Change in Control Severance Plan.*  The amounts of these bonus opportunities and their terms and conditions are set forth in your release agreement.

4.  <u>Retention Bonuses.</u>  As described in the Offer Letter, you will be eligible to receive a retention bonus of ▇▇▇ per month ("Retention Bonus") of your employment from the Closing Date through the conclusion of your Employment Period.  Any partial payments of the retention bonus will be paid based on ▇▇ per day or ▇▇ per week (for a Monday through Friday work week only).  The Retention Bonus will be paid on a quarterly basis during your Employment Period.  If the Company terminates your employment before the conclusion of your Employment Period for any reason other than your Misconduct (as defined below) or Cause (as defined below), you will be entitled to receive (subject to your providing a release of claims upon your termination as referred to in the Offer Letter) any additional Retention Bonuses that you would have been entitled to receive had your employment continued through the end of your Employment Period (up to a maximum of six months' worth of additional Retention Bonuses), any such payment to be made on the sixtieth day following your termination date.  For avoidance of doubt, if you voluntarily terminate your employment before the conclusion of your Employment Period or if your employment is terminated by the Company for Misconduct (as defined below) or for Cause (as defined below), you will <u>not</u> be entitled to any additional Retention Bonus over and above the amounts of the Retention Bonuses that you have received or are entitled to receive based on your employment through your termination date.

5.  <u>Transition Services</u>.  You will be entitled to receive career counseling and career transition consulting services in an amount up to the Career Services Amount (as defined in the *Virgin America Inc. Change in Control Severance Plan*).  These services will be available to you sixty (60) days prior to the conclusion of your Employment Period or termination of your employment.  These services will be provided by Lee Hecht Harrison and directly billed to Alaska Airlines, Inc.  You are responsible for any costs associated with these services incurred in excess of the Career Services Amount.

6.  <u>Travel Benefits</u>.  If you terminate your employment, the Company terminates your employment for any reason other than for Cause (as defined below), or your Employment Period concludes, you will be entitled to receive (subject to your providing a release of claims upon your termination as referred to in the Offer Letter) the travel benefits described in the Offer Letter for the period after the conclusion of your employment.  To the extent such termination by

CONFIDENTIAL

the Company is for any reason other than Misconduct (as defined below) or Cause (as defined below), you will also be entitled to the travel benefits described in the Offer Letter for the period during your employment until the earlier of (i) the date that is six months after your termination or (ii) the scheduled end of your Employment Period as set forth in your Offer Letter. For avoidance of doubt, if the Company terminates your employment for Cause (as defined below) or if your employment by the Company ends due to your death or disability, you will not be entitled to any travel benefits.

7. Housing Allowances. If you currently receive a housing allowance from Virgin America, then the housing allowance will continue unchanged until it expires. The housing allowance will not be renewed thereafter.

8. Definition of Misconduct. As used in the Offer Letter and this Addendum, "Misconduct" means your (i) conviction of, or plea of no contest to, a felony or serious misdemeanor; (ii) participation in a fraud or act of dishonesty against the Company; (iii) material breach of the Company's policies that affects the Company in an adverse way; (iv) an action that causes material damage to the Company's reputation, property, or business; or (v) material neglect of your duties to the Company.

9. Definition of Cause. As used in the Offer Letter and this Addendum, "Cause" means your (i) conviction of, or plea of no contest to, a felony or other crime involving moral turpitude or dishonesty; (ii) participation in a fraud or willful act of dishonesty against the Company that adversely affects the Company in a material way; (iii) willful breach of the Company's policies that affects the Company in a material way; (iv) causing intentional damage to the Company's property or business; or (v) repeated neglect of your duties with the Company; provided, however, that for purposes of clause (v), no conduct will be deemed to constitute "Cause" unless (A) such conduct is committed in bad faith, without reasonable belief that the action or inaction is in the best interests of the Company and (B) if such conduct is capable of being cured, until you have received prior written notice of the conduct, which persists after a 30-day cure period following the written notice.

10. Taxes. All forms of compensation referred to in the Offer Letter and any related release agreement as referred to therein are subject to all applicable tax withholding. Except for such withholding, you will be responsible for your own tax liability imposed with respect to such compensation. It is intended that any amounts payable under the Offer Letter or any such release agreement shall either be exempt from or comply with Section 409A of the U.S. Internal Revenue Code so as not to subject you to payment of any additional tax, penalty or interest imposed under Section 409A, and the provisions of such document shall be construed and interpreted consistent with that intent.

11. Outside Activities. While you render services to the Company, you agree that you will not engage in any other employment, consulting or other business activity without the written consent of the Company. In addition, while you render services to the Company, you will not assist any person or entity in competing with the Company, in preparing to compete with the Company or in hiring any employees or consultants of the Company.

CONFIDENTIAL

12. Entire Agreement.  The Offer Letter, together with this Addendum and the release agreements referred to in the Offer Letter, supersede and replace any prior understandings, negotiations, or agreements, whether oral, written or implied, between you and the Company regarding the matters described therein and herein.  No provision of the Offer Letter or this Addendum may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing signed by the party against whom such modification, waiver or discharge is sought to be enforced.  No waiver by either party hereto at any time of any breach by the other party hereto or compliance with any condition or provision of this agreement to be performed by such other party will be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. The Company reserves the right to amend or terminate its compensation and benefit plans from time to time, with or without advance notice.  The validity, interpretation, construction and performance of this letter shall be governed by the laws of the State of California without regard to the conflicts of laws principles thereof.

13. No Assignment.  The Offer Letter and all of your rights and obligations thereunder are personal to you and may not be transferred or assigned by you at any time.  The Company may assign its rights under the Offer Letter and this Addendum to any entity that assumes the Company's obligations hereunder and thereunder in connection with any sale or transfer of all or a substantial portion of the Company's assets to such entity.

CONFIDENTIAL

## GENERAL RELEASE AGREEMENT

This General Release Agreement (this "Agreement") is entered into this 12th day of July 2016, by and between Stuart Dinnis, an individual ("Employee"), and Virgin America Inc., a Delaware corporation (the "Corporation") (individually, a "party" and collectively, the "parties").

WHEREAS, the Corporation has entered into an Agreement and Plan of Merger, dated April 1, 2016, with Alaska Air Group, Inc. ("AAG") and Alpine Acquisition Corp., a wholly-owned subsidiary of AAG (the "Sub"), pursuant to which the Sub will be merged with and into the Corporation and the Corporation will become a wholly-owned subsidiary of AAG (the "Merger"); and

WHEREAS, subject to the closing of the Merger and to Employee's timely execution and delivery of this Agreement and the Supplemental Release Agreements in the forms attached hereto as Exhibits A and B (the "Supplemental Releases"), each as contemplated by Section I below, Employee is entitled to the benefits described in Employee's offer letter from Alaska Airlines, Inc. dated June 24, 2016 and the addendum thereto (collectively, the "Offer Letter"), which benefits include (but are not limited to) certain retention bonus payments on the terms set forth in the Offer Letter (the "Retention Bonus") and the following bonus opportunities (in lieu of cash severance):

(a)     the payment of a bonus in the amount of ▉▉▉▉▉▉, such bonus to be paid on the sixtieth (60th) day following the date of the closing of the Merger (the "Closing Date"), subject to Employee's continued employment with the Corporation or one of its subsidiaries or affiliates through the Closing Date (the "Closing Bonus"), provided that if, prior to the Closing Date, Employee's employment is terminated by the Corporation or one of its subsidiaries or affiliates without Cause (as defined below), the Closing Bonus will be payable on the sixtieth (60th) day following such termination of Employee's employment (for purposes of clarity, Employee will not be entitled to the Closing Bonus if Employee voluntarily terminates his or her employment, or Employee's employment is terminated for Cause or due to Employee's death or disability, prior to the Closing Date); and

(b)     the payment of a bonus in the amount of ▉▉▉▉▉, such bonus to be paid on the sixtieth (60th) day following the conclusion of the Employment Period described in the Offer Letter (the "Retention Date"), subject to Employee's continued employment with the Corporation or one of its subsidiaries or affiliates through the Retention Date (the "Employment Period Bonus"), provided that if, prior to the Retention Date, Employee's employment is terminated by the Corporation or one of its subsidiaries or affiliates without Cause, the Employment Period Bonus will be payable on the sixtieth (60th) day following such termination of Employee's employment (for purposes of clarity, Employee will not be entitled to the Employment Period Bonus if Employee voluntarily terminates his or her employment, or Employee's employment is terminated for Cause or due to Employee's death or disability, prior to the Retention Date).

CONFIDENTIAL

For purposes of the Closing Bonus and the Employment Period Bonus, "Cause" shall mean Employee's (i) conviction of, or plea of no contest to, a felony or other crime involving moral turpitude or dishonesty; (ii) participation in a fraud or willful act of dishonesty against the Corporation that adversely affects the Corporation in a material way; (iii) willful breach of the Corporation policies that affects the Corporation in a material way; (iv) causing intentional damage to the Corporation's property or business; or (v) repeated neglect of Employee's duties with the Corporation; provided, however, that for purposes of clause (v), no conduct will be deemed to constitute "Cause" unless (A) such conduct is committed in bad faith, without reasonable belief that the action or inaction is in the best interests of the Corporation and (B) if such conduct is capable of being cured, until Employee has received prior written notice of the conduct, which persists after a 30-day cure period following the written notice.  As used in this definition, the term "Corporation" includes the Corporation, AAG, and each of their respective subsidiaries and affiliates.

NOW, THEREFORE, in consideration of the covenants undertaken and the releases contained in this Agreement, Employee and the Corporation agree as follows:

I.     **Delivery of Release Agreement and Supplemental Release Agreements.** Employee's right to receive the benefits provided in Section II is subject to (a) Employee's execution and delivery of this Agreement to the Corporation no later than the close of business on July 1, 2016, (b) Employee's execution and delivery of the First Supplemental Release Agreement attached hereto as Exhibit A (the "First Supplemental Release") to the Corporation no later than the close of business on the date that is sixty (60) days after the Closing Date (and in no event earlier than the Closing Date) and Employee's not revoking the First Supplemental Release pursuant to any revocation right afforded by applicable law, and (c) in the case of the Employment Period Bonus, Employee's execution and delivery of the Second Supplemental Release Agreement attached hereto as Exhibit B (the "Second Supplemental Release") to the Corporation no later than the close of business on the date that is sixty (60) days after the Retention Date or, if earlier, the date of an involuntary termination of Employee's employment that triggers payment of the Employment Period Bonus as provided above (and in no event earlier than the first to occur of such dates) and Employee's not revoking the Second Supplemental Release pursuant to any revocation right afforded by applicable law.

II.     **Bonuses; Waiver of Benefits Under Prior Agreements.** Employee's right to receive the Closing Bonus, the Employment Period Bonus, and the Retention Bonus as described above, as well as the other benefits pursuant to the Offer Letter as described above (the "Offer Letter Benefits"), is subject to Employee's compliance with Section I and Employee's continued compliance with his or her obligations hereunder.  In consideration for such bonuses and without limiting the generality of the releases set forth in Sections IV-VI below, Employee hereby expressly and irrevocably waives his or her rights to receive any payments or benefits under the Virgin America Inc. Change in Control Severance Plan (the "CIC Plan"), including, without limitation, any severance payments or benefits provided therein; and hereby acknowledges and agrees that Employee's participation in the CIC Plan has terminated.

CONFIDENTIAL

III.   **Acknowledgment of Wage Payments.**  Employee acknowledges and agrees that Employee has received, and the Corporation has paid all salary and wages that Employee has earned (other than with respect to the current payroll period).

IV.   **Release.**  Employee, on his or her own behalf and on behalf of his or her descendants, dependents, heirs, executors, administrators, assigns and successors, and each of them, hereby acknowledges full and complete satisfaction of and releases and discharges and covenants not to sue the Corporation and each of its respective divisions, subsidiaries, parents, or affiliated corporations, past and present, and each of them, as well as its and their assignees, successors, directors, officers, stockholders, partners, representatives, attorneys, agents or employees, past or present, or any of them (individually and collectively, "Releasees"), from and with respect to any and all claims, agreements, obligations, demands and causes of action, known or unknown, suspected or unsuspected, arising out of or in any way connected with Employee's employment or any other relationship with or interest in the Corporation, including without limiting the generality of the foregoing, any claim for severance pay, profit sharing, bonus or similar benefit, equity-based awards and/or dividend equivalents thereon, pension, retirement, life insurance, health or medical or disability insurance or any other fringe benefit, except as otherwise provided herein and in the Offer Letter, or any other claims, agreements, obligations, demands and causes of action, known or unknown, suspected or unsuspected resulting from any act or omission by or on the part of Releasees committed or omitted prior to the date of this Agreement, including, without limiting the generality of the foregoing, any claim under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Americans with Disabilities Act, the Family and Medical Leave Act, the Fair Credit Reporting Act, the Employee Retirement Income Security Act of 1974, the Sarbanes-Oxley Act, the California Fair Employment and Housing Act, the California Labor Code (including, by way of example but not of limitation, Section 132a), the California Business and Profession Code, the Industrial Welfare Commission Wage Orders, the California Family Rights Act, or any other federal, state, or local law, principle of law, regulation, or ordinance (collectively, the "Claims"); provided that such release shall not apply to any obligation with respect to the Closing Bonus, the Employment Period Bonus, and the Retention Bonus, as well as the Offer Letter Benefits and any benefits that may be provided under Sections 2(b) and 2(d) under the CIC Plan, and provided further that this release does not cover any Claim that cannot be so released as a matter of applicable law, including, but not limited to, the right to file a charge with or participate in an investigation conducted by certain government agencies.  Employee does waive, however, the right to any monetary recovery, should any agency pursue any claims on Employee's behalf, if this waiver is permitted by applicable law.  Employee acknowledges and agrees that he or she has received any and all leave and other benefits that he or she has been and is entitled to pursuant to the Family and Medical Leave Act of 1993.

V.   **1542 Waiver.**  It is the intention of Employee in executing this Agreement that the same shall be effective as a bar to each and every Claim hereinabove specified.  In furtherance of this intention, Employee hereby expressly waives any and all rights and benefits conferred upon him or her by the provisions of SECTION 1542 OF THE CALIFORNIA CIVIL CODE and expressly consents that this Agreement (including, without limitation, the Release set forth above) shall be given full force and effect according to each and all of its express terms and provisions, including those related to unknown and unsuspected Claims, if any, as well as those relating to any other Claims hereinabove specified. SECTION 1542 provides:

CONFIDENTIAL

VX00092

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Employee acknowledges that he or she may hereafter discover Claims or facts in addition to or different from those which Employee now knows or believes to exist with respect to the subject matter of this Agreement and which, if known or suspected at the time of executing this Agreement, may have materially affected this settlement. Nevertheless, Employee hereby waives any right, Claim or cause of action that might arise as a result of such different or additional Claims or facts. Employee acknowledges that he or she understands the significance and consequences of the foregoing Release and such specific waiver of SECTION 1542.

VI.   **No Transferred Claims.** Employee represents and warrants to the Corporation that Employee has not heretofore assigned or transferred to any person not a party to this Agreement any released matter or any part or portion thereof.

VII.   **Confidentiality.** Employee hereby acknowledges and agrees that Employee is and will continue after the date hereof to be subject to any confidentiality or other restrictive covenants in favor of the Corporation as and to the extent provided in any employment agreement, offer letter or similar agreement Employee may have with the Corporation, or established by applicable law (the "Confidentiality Obligations"). In addition, the parties hereby acknowledge and agree that the information contained in this Agreement, the Supplemental Releases, the Offer Letter, and any other communications related to such agreements and the Offer Letter are confidential and shall not be disclosed by a party to any other person, except as required to comply with applicable law and except for necessary disclosure to a party's respective subsidiaries and affiliates and legal, tax, and financial advisors who also agree to keep such information confidential. Notwithstanding the foregoing sentence, a party may truthfully respond to a lawful and valid subpoena or other legal process and may disclose such information where required to satisfy legal requirements. In addition, nothing herein shall preclude a party from providing truthful information or documents to a government authority with jurisdiction over such party in connection with an investigation by that authority, as to a possible violation of applicable law.

VIII.   **Miscellaneous.**

A.   **Successors.**

(i)   This Agreement is personal to Employee and shall not, without the prior written consent of the Corporation, be assignable by Employee.

(ii)   This Agreement shall inure to the benefit of and be binding upon the Corporation and its respective successors and assigns and any such successor or assignee shall be deemed substituted for the Corporation under the terms of this Agreement for all purposes. As used herein, "successor" and "assignee" shall include any person, firm, corporation or other

CONFIDENTIAL

VX00093

business entity which at any time, whether by purchase, merger or otherwise, directly or indirectly acquires the ownership of the Corporation or to which the Corporation assigns this Agreement by operation of law or otherwise.

**B. Waiver.** No waiver of any breach of any term or provision of this Agreement shall be construed to be, nor shall be, a waiver of any other breach of this Agreement. No waiver shall be binding unless in writing and signed by the party waiving the breach.

**C. Modification.** This Agreement may not be amended or modified other than by a written agreement executed by Employee and the Chief Executive Officer of the Corporation or his or her designee.

**D. Complete Agreement.** This Agreement constitutes and contains the entire agreement and final understanding concerning Employee's relationship with the Corporation and its affiliates and the other subject matters addressed herein between the parties, and supersedes and replaces all prior negotiations and all agreements proposed or otherwise, whether written or oral, concerning the subject matters hereof. Any representation, promise or agreement not specifically included in this Agreement shall not be binding upon or enforceable against either party. This Agreement is an integrated agreement; provided, however, that Employee's obligations under the Confidentiality Obligations are outside the scope of this integration provision.

**E. Severability.** If any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect other provisions or applications of this Agreement which can be given effect without the invalid provisions or applications and to this end the provisions of this Agreement are declared to be severable.

**F. Governing Law.** This Agreement shall be deemed to have been executed and delivered within the State of California, and the rights and obligations of the parties hereunder shall be construed and enforced in accordance with, and governed by, the laws of the State of California without regard to principles of conflict of laws.

**G. Legal Counsel; Mutual Drafting.** Each party recognizes that this is a legally binding contract and acknowledges and agrees that they have had the opportunity to consult with legal counsel of their choice. Each party has cooperated in the drafting, negotiation and preparation of this Agreement. Hence, in any construction to be made of this Agreement, the same shall not be construed against either party on the basis of that party being the drafter of such language. Employee agrees and acknowledges that Employee has read and understands this Agreement, is entering into it freely and voluntarily, and has been advised to seek counsel prior to entering into this Agreement and has had ample opportunity to do so.

**H. Notices.**

(i)     All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given and made if delivered by hand, otherwise delivered against receipt therefor, or sent by registered or certified mail, postage prepaid, return receipt requested. Any notice shall be duly addressed to the parties hereto as follows:

CONFIDENTIAL

VX00094

(a) if to the Corporation:

> Virgin America Inc.
> ▮ Airport Boulevard
> Burlingame, CA 94010
> Attn: Senior Vice President, People & In-flight Services

> with a copy to:

> Alaska Airlines, Inc.
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> Seattle, WA 98188
> Attn: Vice President, Human Resources

(b) if to Employee, at the last address of Employee on the books of the Corporation.

(ii)   Any party may alter the address to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this section for the giving of notice. Any communication shall be effective when delivered by hand, when otherwise delivered against receipt therefor, or five (5) business days after being mailed in accordance with the foregoing.

I.   **Counterparts.**  This Agreement may be executed in counterparts, and each counterpart, when executed, shall have the efficacy of a signed original. Photographic copies of such signed counterparts may be used in lieu of the originals for any purpose.

J.   **Arbitration of Disputes.**  Any timely controversy or claim arising out of or relating to this Agreement, its enforcement, arbitrability, interpretation, and/or the termination thereof, the employment or other relationship between the parties and/or the termination thereof, or any alleged breach, default, or misrepresentation in connection with this Agreement or any of its provisions, including, by way of example but not of limitation, and, without limiting the generality of the foregoing, any alleged violation of local, state, or federal statute, common law or constitution, regardless of which party is pressing the claim, shall be submitted to final and binding arbitration, to be held in San Francisco, California, before a single arbitrator selected from the Judicial Arbitration and Mediation Services, Inc. ("JAMS"), in accordance with the then-current JAMS Arbitration Rules and Procedures for employment disputes (which may be found at www.jamsadr.com under the Rules/Clauses tab), as modified by the terms and conditions in this paragraph; provided, however, that this agreement to arbitrate does not apply to any claims that as a matter of law cannot be subject to arbitration. The parties will select the arbitrator by mutual agreement or, if the parties cannot agree, then by striking from a list of qualified arbitrators supplied by JAMS from its labor and employment law panel. Final resolution of any dispute through arbitration may include any remedy or relief that is provided for by any applicable law. Statutes of limitations shall be the same as would be applicable if the action were brought in court. The arbitrator selected pursuant to this Agreement will allow such discovery as is necessary for a full and fair exploration of the issues and dispute, consistent with the expedited nature of arbitration. At the conclusion of the arbitration, the arbitrator shall issue

CONFIDENTIAL

a written decision that sets forth the essential findings and conclusions upon which the arbitrator's award or decision is based.  Any award or relief granted by the arbitrator under this Agreement shall be final and binding on the parties to this Agreement and may be enforced by any court of competent jurisdiction.  The Corporation will pay all arbitration costs, including the arbitrator's fees, provided that if Employee is the party initiating the claim, s/he will pay an arbitration filing fee not to exceed the filing fee to initiate a claim in the court of general jurisdiction in the state in which Employee is (or was last) employed by the Corporation or any of its subsidiaries or affiliates, recognizing, however, that each side bears its own deposition, witness, expert and attorneys' fees and other expenses to the same extent as if the matter were being heard in court.  If, however, any party prevails on a claim, which affords the prevailing party attorneys' fees and costs, then the arbitrator may award reasonable fees and costs to the prevailing party.  The arbitrator may not award fees or costs to a party that would not otherwise be entitled to such an award under applicable law.  The arbitrator shall resolve any dispute as to the reasonableness of any fee or cost.  **The parties acknowledge and agree that they are hereby waiving any rights to trial by jury in any action or proceeding brought by either of the parties against the other in connection with any matter whatsoever arising out of or in any way connected with this Agreement (and/or the termination thereof), the employment or other relationship between the parties (and/or the termination thereof), and/or any alleged breach, default, or misrepresentation in connection with this Agreement or any of its provisions.**

**K. Number and Gender**.  Where the context requires, the singular shall include the plural, the plural shall include the singular, and any gender shall include all other genders.

**L. Headings**.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**M. Taxes**.  The Corporation has the right to withhold from any payment hereunder or under any other agreement between the Corporation and Employee the amount required by law to be withheld with respect to such payment or other benefits provided to Employee.  Other than as to such withholding right, Employee shall be solely responsible for any taxes due as a result of the payments and benefits received by Employee contemplated by this Agreement.

*[Remainder of page intentionally left blank.]*

CONFIDENTIAL

I have read the foregoing agreement and I accept and agree to the provisions it contains and hereby execute it voluntarily with full understanding of its consequences.

EXECUTED this _12th_ day of _July_ 2016, at _San Francisco_, California.

"Employee"

Stuart Dinnis

EXECUTED this _25th_ day of _July_ 2016, at _Burlingame_, California.

"Corporation"

Virgin America Inc.,
a Delaware corporation,

By:     Frances Fiorillo
Its:     Senior Vice President, People & Inflight

CONFIDENTIAL

VX00097



July 19, 2016

Stuart Dinnis, Director Guest Loyalty
Virgin America Inc.
███   Airport Boulevard
Burlingame, CA  94010

Dear Stuart,

We're writing to clarify the terms of your June 24, 2016 offer letter and to make a change to the related release agreement as follows:

- In your offer letter, please replace the paragraph concerning your travel benefit rights after your Employment Period ends, with the following paragraph:

  *In exchange for waiving your travel benefit rights under the CIC plan, you and your eligible dependents will be provided with* ████████████████████ *on Virgin America beginning at the conclusion of the Employment Period. Upon merging of the Virgin America and Alaska Airlines travel programs, your travel will be on all flights flown by or for Alaska Air Group airlines and governed by the Alaska Airlines travel policy.*

- We would like to revise your General Release Agreement to provide you with additional death or disability benefits with respect to your Employment Period Bonus.

You do not need to take any additional action to make this clarification to your offer letter effective.  The General Release Agreement, however, requires that any modifications be in a written agreement executed by you and David Cush.  Therefore, if you would like to take advantage of this change, then please sign the enclosed General Release Agreement Modification and return it to Frances Fiorillo no later than July 21, 2016.

Sincerely,

Tammy Young, VP Human Resources

PO Box 68900, Seattle, WA 98168
███████████

CONFIDENTIAL



VX00098

## GENERAL RELEASE AGREEMENT MODIFICATION

This General Release Agreement Modification (this "Agreement") is entered into this 21 day of July 2016, by and between Stuart Dinnis, an individual ("Employee"), and Virgin America Inc., a Delaware corporation (the "Corporation") (individually, a "party" and collectively, the "parties").

WHEREAS, the Corporation has entered into an Agreement and Plan of Merger, dated April 1, 2016, with Alaska Air Group, Inc. ("AAG") and Alpine Acquisition Corp., a wholly-owned subsidiary of AAG (the "Sub"), pursuant to which the Sub will be merged with and into the Corporation and the Corporation will become a wholly-owned subsidiary of AAG (the "Merger");

WHEREAS, the Employee and the Corporation have entered into a General Release Agreement dated July 12, 2016 ("General Release Agreement"); and

WHEREAS, the Employee and the Corporation desire to modify the General Release Agreement.

NOW, THEREFORE, the Employee and the Corporation agree to the following modifications:

I.       Subparagraph (b) of the second "WHEREAS" clause in the General Release Agreement will be stricken and replaced with the following revised subparagraph (b):

(b)      the payment of a bonus in the amount of ▮▮▮▮▮, such bonus to be paid on the sixtieth (60th) day following the conclusion of the Employment Period described in the Offer Letter (the "Retention Date"), subject to Employee's continued employment with the Corporation or one of its subsidiaries or affiliates through the Retention Date (the "Employment Period Bonus"), provided that if, prior to the Retention Date, Employee's employment is terminated by the Corporation or one of its subsidiaries or affiliates without Cause, the Employment Period Bonus will be payable on the sixtieth (60th) day following such termination of Employee's employment.  For purposes of clarity, Employee will not be entitled to the Employment Period Bonus if Employee voluntarily terminates his or her employment, or Employee's employment is terminated for Cause, prior to the Retention Date.  For purposes of further clarity, if Employee's employment is terminated due to death or disability prior to the conclusion of the Employment Period, then Employee will receive the Employment Period Bonus prorated based on the number of complete months worked before the death or disability necessitating employment termination.

II.      Any reference to the Offer Letter Benefits described in the General Release Agreement will be deemed to incorporate the clarification made to the post-Employment Period travel benefits described in the letter from Tammy Young to Employee dated July 19, 2016.

CONFIDENTIAL

III.    All other parts of the General Release Agreement have not been modified, remain in full force and effect, and are incorporated herein.

I have read the foregoing modifications to the General Release Agreement as set forth in this Agreement. I accept and agree to the provisions in this Agreement and hereby execute it voluntarily with full understanding of its consequences.

EXECUTED this _21 st_ day of July 2016, at _burlingame_, California.

"Employee"

Stuart Dinnis

EXECUTED this _27_ day of July 2016, at _Burlingame_, California.

"Corporation"

Virgin America Inc.,
a Delaware corporation,

By:  David Cush
Its:   Chief Executive Officer

CONFIDENTIAL

# EXHIBIT I

**To:** Mark Vorzimmer[Mark Vorzimmer ▊▊▊▊▊]
**From:** Stuart Dinnis
**Sent:** Sat 10/29/2016 1:59:07 PM
**Subject:** Re: Screen shot

Hi Diane & Mark,

I've taken some time overnight to reflect on our discussion and my actions and want to provide the following.

Firstly, my sincere apologies and deepest regrets for what has happened between myself and ▊▊▊▊ Jane Doe and if you're in communication with her please pass those on also.

I grew up in a small town in country Australia and this is not something I take lightly nor is it aligned with my personal values and I'm sick inside thinking of myself as a sexual predator of some sort.  I do recall there being some differences between my description of events and Mark's recount and specific questions yesterday and cannot recall anything to match.  As I admitted I was heavily intoxicated as were others at the event.  This is where I do know I have a serious problem, my alcohol consumption outside of work hours and mostly away from work situations has been out of control in recent times.  My consumption in the past has never lead to any situation of harassment or physical abuse as this simply has never been in my nature.  I always thought I was in control of my consumption, actions and perception but now that seems not the case.  My wife has been trying to get me to limit my alcohol for some time as it has worsened over past months, so now I realize I need to seek professional help.  Whilst I have tried to keep my composure at work throughout all challenges over the past 2 years, I have used alcohol to deal with the stress and hide it.

I realize also that there are a number of other actions I need to take:

- personal written apology to ▊▊▊▊ Jane Doe (if you deem this appropriate)

- No further contact or involvement

- Strict confidentiality of the matter

- Regular training and testing on Virgin America policy ongoing

- Discussion with legal experts to ensure my comprehension and ongoing compliance

- Professional support in regards to my alcoholism

CONFIDENTIAL

\- Other counseling as required

\- No further attendance at industry events and conferences representing Virgin America and to avoid any contact with ███████████
                                                    Jane Doe

With the merger all partnership work will not report to me and be taken up by someone in the Mileage Plan team within 90days.

I beg Virgin America to preserve my employment and support my actions above and believe I still have a lot to contribute to the merged entity and am more than willing to work hard and comply with all requirements to ensure this never happens again.

Sincere Regards,

Stuart

(650) ██████

---

**From:** Mark Vorzimmer ████████████████
**Sent:** Saturday, 29 October 2016 7:57 AM
**To:** Stuart Dinnis
**Subject:** RE: Screen shot

Thanks, MV

**From:** Stuart Dinnis ███████████████████
**Sent:** Friday, October 28, 2016 1:46 PM
**To:** Mark Vorzimmer
**Subject:** Re: Screen shot

CONFIDENTIAL